IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT W. HILL,<br><br>        Plaintiff,<br><br>        vs.<br><br>BEST MEDICAL INTERNATIONAL,<br>INC.,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 07-1709<br>(Related to CA No. 08-1404<br>   and CA No. 09-1194) |

| | | |
|---|---|---|
| BEST MEDICAL INTERNATIONAL,<br>INC.,<br><br>        Plaintiff,<br><br>        vs.<br><br>DAVID SPELLMAN, JOHN DAVID<br>SCHERCH and MARCUS D. BITTMAN,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 08-1404<br>(Related to CA No. 07-1709<br>   and CA No. 09-1194)<br>(All cases consolidated at<br>   CA No. 07-1709) |

| | | |
|---|---|---|
| BEST MEDICAL INTERNATIONAL,<br>INC.,<br><br>        Plaintiff,<br><br>        vs.<br><br>ACCURAY, INC., a corporation,<br>ROBERT HILL, DAVID SPELLMAN,<br>JOHN DAVID SCHERCH, MARCUS<br>BITTMAN, JOHN DOE ONE, JOHN<br>DOE TWO, JOHN DOE THREE, JOHN<br>DOE FOUR and JOHN DOE FIVE,<br>individually,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 09-1194<br>(Related to CA No. 07-1709<br>   and CA No. 08-1404)<br>(All cases consolidated at<br>   CA No. 07-1709) |

## MEMORANDUM OPINION

On December 14, 2007, Robert Hill filed a straight-forward breach of contract claim against his former employer, Best Medical

International, Inc., alleging he had been denied severance benefits after his job responsibilities were substantially reduced during a corporate reorganization and downsizing. In the following four years, this and two related cases have mushroomed to include claims of trade secret misappropriation, breach of non-compete and non-disclosure agreements, conspiracy, tortious interference with contracts, aiding and abetting breach of fiduciary duty, and an attempt to add a patent infringement claim. The cases were consolidated in March 2010 for pretrial proceedings and have reached the summary judgment stage simultaneously. In this omnibus opinion, we consider the three pending motions and grant summary judgment in favor of the moving parties on all issues.

## I.  INTRODUCTION

### A.  Common Facts[1]

Beginning in 1993, Robert Hill ("Hill") was employed by NOMOS Corporation ("NOMOS"), a manufacturer of radiation therapy equipment. The equipment provided by NOMOS and other companies in this field requires complex computer programming in order to achieve extremely precise radiation therapy. After NOMOS was acquired by North American Scientific, Inc. ("NAS"), Hill assumed the title of Vice President for Engineering & Development. In this

---

[1] The facts in this section are undisputed and are taken from the parties' statements and exhibits at Docs. No. 120, 121, 129, 130, 131, 133, 134, 138, 141, 142, 150, 151, 155, 156, 160 and 161. Additional facts are provided as each individual claim or counterclaim is discussed below.

2

position, he had access to confidential and trade secret information used by NOMOS, e.g., computer source code and files regarding the company's products and services, product development documents and information, and marketing research materials.

In February 2001, Hill entered into an agreement with NOMOS which contained confidentiality provisions and a clause prohibiting him from working for any NOMOS competitor for a period of two years after he left the company ("the Hill-NOMOS Agreement.") It also provided that any successor-in-interest to NOMOS would have the right to enforce the Hill-NOMOS Agreement.

On April 23, 2007, NOMOS, NAS, and Hill entered into an additional agreement which provided certain salary and health care benefits triggered by two sets of circumstances:

    (i)   involuntary termination of your employment with [NOMOS] other than Termination for Cause or

    (ii)  your voluntary resignation *within sixty (60) days* following

           (A) a change in your position at [NOMOS] which materially reduces your duties and responsibilities or
           (B) a relocation of your principal place of employment by more than fifty(50) miles.

(Complaint, Doc. No. 1, ¶ 10; *see also* Exh. B thereto, emphasis in original.)[2]

On September 11, 2007, NOMOS and Best Medical International,

---

[2]   Unless otherwise noted, docket numbers are those in Hill v. Best Medical, CA No. 07-1709.

Inc. ("BMI" or "Best Medical"), entered into an agreement under
which BMI acquired substantially all of NOMOS's assets ("the
Purchase Agreement.")   BMI develops, manufactures, and supplies
medical providers throughout the United States with oncology and
radiation therapy products (e.g., radiation treatment planning
systems, image guided radiation therapy systems, and conformal
radiation therapy systems.)

BMI acquired certain confidential and proprietary information
and trade secrets belonging to NOMOS under the terms of the
Purchase Agreement.   Another provision required BMI to assume
certain liabilities of NOMOS, including the agreements NOMOS had
with some of its employees, except for obligations to pay retention
bonuses or provide stock benefits.   This provision applied to the
employment and severance agreements between Hill and NOMOS.

Almost immediately after the Purchase Agreement was signed
(i.e., after "the Acquisition"), BMI began restructuring and
reorganizing the departments acquired from NOMOS.   While Hill was
out of the office on vacation for a few days in late September
2007, a consultant hired by BMI met with employees of the
Engineering Department and explained that all product development
functions would be outsourced and the responsibilities of BMI
engineers would be limited to defining the products to be developed
via outsourcing.   Hill was not advised of this change by BMI
management before it was made and did not learn of it until

4

affected employees spoke with him afterward.

While on vacation, Hill had travelled to California to meet with the management of a company called Accuray Corporation ("Accuray.")   Like BMI, Accuray provides radiation treatment planning systems and image guided therapy systems.   Hill interviewed with several managers with the intention of going to work for Accuray soon thereafter.

On October 1, 2007, Hill met with the president and owner of BMI, Krishnan Suthanthiran, along with other senior members of the BMI management team.   Mr. Suthanthiran formally advised Hill of the change in product development strategy about which employees in the Engineering Department had already been told, and informed Hill that his new position would be Director of Software for an new entity to be called Best Medical Research.   On October 2, 2007, Mr. Suthanthiran terminated the employment of several employees who reported to Hill, again without prior consultation, and scheduled meetings with six others for October 3.

On October 4, 2007, Hill submitted a resignation letter to BMI in which he stated he believed he was entitled to severance benefits under the circumstances, that is, he was resigning within 60 days after a change in position resulting in a material reduction in his duties and responsibilities.   (Doc. No. 1, Exh. D.)   In-house counsel for BMI responded that company management did not believe there had been any change in Hill's position which

materially reduced his job duties or responsibilities and that therefore no severance applied.   (Id., Exh. E.)  On October 24, 2007, Hill received an offer for the position of Senior Director of Treatment Planning Systems with Accuray and began employment with the company on November 14, 2007.

Three other BMI employees, all of whom had reported to Hill, left soon after and eventually went to work for Accuray.  David Scherch ("Sherch") had been employed by NOMOS for almost 15 years and, at the time of the Acquisition, was the Technical Leader for the Technology Innovation Group where he was responsible for strategic planning for product development.   David Spellman ("Spellman") went to work as a software engineer with NOMOS beginning in March 2001; his duties included product development and interacting with existing and potential customers at trade shows.  Marcus Bittman ("Bittman") was employed by NOMOS in March 2001 as an associate software engineer.  At the time of the Acquisition, Bittman was the Marketing Manager and responsible for interacting with the company's existing and potential customers.

In their positions, Bittman, Scherch, and Spellman had continual access to confidential and proprietary business information and trade secrets belonging to NOMOS and/or BMI.[3]  As a condition of their employment, all three had signed agreements with

---

[3]    For the sake of brevity, we will use the phrase "BMI Confidential Information" to mean "all confidential and proprietary business information and trade secrets belonging to NOMOS and/or BMI."

NOMOS which contained non-compete and non-disclosure provisions;
Scherch and Spellman had signed similar agreements with BMI after
the Acquisition.  Between October 2007 and June 2008, they all left
BMI and went to work for Accuray.  Although a provision in each of
their employment agreements required them to inform BMI of their
subsequent employment, none of them did so.

      B.    Procedural History; Claims and Counterclaims

      Hill filed a single-count suit in this Court on December
14, 2007, alleging breach of contract arising from BMI's refusal to
pay the severance benefits to which he believed he was entitled.
(See Hill v. Best Medical Int'l, CA No. 07-1709, "the Hill Case.")
On February 15, 2008, BMI filed its answer and affirmative
defenses, along with four counterclaims.  (Doc. No. 3.)

      According to BMI, before Hill announced his resignation, he
"copied, removed and/or retained confidential and proprietary
business information and trade secrets belonging to [BMI],
including but not limited to computer files that included source
code and other items related to Best Medical's products."  (Doc.
No. 3, ¶ 74.)   In Counterclaim I, BMI alleged that Hill had
breached his employment agreement by retaining BMI Confidential
Information and by using and/or intending to use it for the benefit
of Accuray.  Counterclaim II alleged that Hill had breached his
fiduciary duty of loyalty to BMI by failing to keep the information
confidential.  Counterclaim III alleged that Hill had violated the

7

Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S. § 5301 *et seq.* ("PUTSA") and in Counterclaim IV, that his acts of copying and retaining BMI Confidential Information constituted conversion.

BMI and Hill proceeded according to a case management order under which fact discovery was to be completed by September 30, 2008, with a post-discovery conference set for October 7, 2008.  On October 6, 2008, BMI filed a new complaint against Bittman, Scherch, and Spellman.  (Best Medical Int'l v. Spellman *et al.*, CA 08-1404, "the Spellman Case.")   In Counts I and II, BMI claimed that Scherch had breached the confidentiality, non-compete and next employment notification provisions of his employment agreements with BMI and NOMOS, respectively.  Identical claims were raised against Spellman in Counts III and IV, plus, in Count V, breach of the confidentiality clause of his 2008 BMI consulting agreement. Count VI alleged breaches of Bittman's 2001 employment contract with NOMOS.  Finally, Count VII alleged violation of the PUTSA by all three defendants.

A case management order was entered in the Spellman Case, allowing limited discovery prior to mediation.  Based on the representations of the parties that they were engaging in settlement negotiations, the Court temporarily suspended all discovery deadlines on December 3, 2008, and again on February 25, 2009.  Mediation eventually took place on June 19, 2009, jointly with the Hill Case; it was  unsuccessful.  A joint status

conference was set for July 14, but when BMI changed counsel at the eleventh hour on July 13, the conference was postponed until September 10, 2009.

On September 2, 2009, BMI filed another new complaint, this time against Hill, Scherch, Bittman, Spellman (collectively, "the Individual Defendants") and Accuray. (See Best Medical Int'l v. Accuray, Inc., et al., CA No. 09-1194, "the Accuray Case.") In addition to the general allegations in the Hill and Spellman Cases, BMI alleged that immediately after learning of the change of ownership in NOMOS, the Chief Operating Officer of Accuray had approached Hill to induce him to come to work for one of BMI's most significant competitors. Hill then recruited Bittman, Scherch and Spellman to join Accuray. BMI further alleged that when Accuray recruited Hill, it was aware that he had access to BMI Confidential Information and encouraged him to download "tens of thousands" of computer files. In this complaint, BMI stated six claims:

Count I    tortious interference with the employment contracts between BMI and Bittman, Scherch and Spellman by Accuray, Hill, and John Does 1 through 5;[4]

Count II   civil conspiracy on the part of all Defendants;

Count III  violation of the PUTSA by Accuray;

---

[4] John Does 1 through 5, who were apparently, but not clearly, employees of Accuray, are referred to in the complaint filed in the Accuray Case at ¶¶ 8-12. There are no factual allegations against them specifically, as compared to the other defendants, in Counts I, II and IV. They have never, to the best of the Court's ability to discern, been mentioned again in any pleading filed in these three cases.

Count IV   aiding and abetting breach of fiduciary obligations by Accuray and John Does 1 through 5 with regard to the duties of the Individual Defendants;

Count V    conversion by Accuray; and

Count VI   unfair competition by Accuray.

The Hill and Spellman Cases were again stayed until the pleadings in the Accuray Case were closed. The stay was lifted on February 18, 2010, and a case management conference was held on March 16, 2010. At that time, a joint case management order was entered, directing the cases to be consolidated for all pre-trial proceedings. The cases were once more referred to mediation,[5] which was again unsuccessful. Numerous disputes regarding the trade secret claims slowed the discovery process, as did the fact that less than three weeks before the post-discovery conference was to be held, BMI again changed counsel.

The parties eventually filed three motions for summary judgment: Docket No. 117 by Accuray, seeking dismissal of all Counts in the Accuray Case insofar as the allegations pertained to it; Docket No. 137, a motion by Hill seeking judgment in his favor

---

[5]  On June 3, 2010, the date initially set for the joint mediation, BMI filed a motion to amend its complaint in the Accuray Case, seeking to add a claim for patent infringement. (Doc. No. 51.)  Accuray, Spellman, Bittman, and Scherch opposed the motion and the Court denied the motion on June 24, 2010. (Doc. No. 61.)  On August 6, 2010, BMI filed suit against Accuray and the four Individual Defendants at CA No. 10-1043.  On March 9, 2011, Judge Terrance F. McVerry of this court dismissed all claims against the individuals. (CA No. 10-1043, Doc. No. 46.)  The patent infringement claims against Accuray have not been resolved as of the date of this Memorandum Opinion.

on his claim for breach of the severance agreement and on all four
Counterclaims by BMI in the Hill Case, along with judgment in his
favor on Counts I and II of the Accuray Case; and Docket No. 139, a
motion by Bittman, Scherch, and Spellman seeking judgment in their
favor as to all Counts in the Spellman Case and Count II of the
Accuray Case.  The parties having fully briefed their positions,
the three motions are now ripe for decision.

## II.  JURISDICTION AND VENUE

BMI is a Virginia corporation with its principal place of
business in Springfield, Virginia.  Accuray is a California
corporation with its principal place of business in Sunnyvale,
California.  Hill was a resident of Pennsylvania at the time he
filed his complaint and is currently a resident of California;
Bittman, Scherch, and Spellman were residents of Pennsylvania.
This Court therefore has jurisdiction over each of the three cases
based on complete diversity of the parties thereto and, according
to the various complaints, an amount in controversy in excess of
the statutory minimum.  *See* 28 U.S.C. § 1332(a)-(c).  Venue is
appropriate in this Court under 28 U.S.C. § 1391(a) inasmuch as a
substantial part of the events giving rise to the claims occurred
in the Western District of Pennsylvania where Accuray maintains an
office.

## III.  STANDARD FOR SUMMARY JUDGMENT

A court may grant summary judgment if the party so moving can

show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); Sollon v. Ohio Cas. Ins. Co., 396 F. Supp.2d 560, 568 (W.D. Pa. 2005). If a reasonable jury could return a verdict for the non-movant, the dispute is genuine and if, under substantive law, the dispute would affect the outcome of the suit, it is material. A factual dispute between the parties that is both genuine and material will defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).

In considering a motion for summary judgment, the court must view all evidence in the light most favorable to the non-movant, accept the non-movant's version of the facts as true, and draw all reasonable inferences and resolve any conflicts in its favor. Sollon, id., *citing* Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). In short, the movant must show that if the pleadings, depositions and other evidentiary material were admissible at trial, the other party could not carry its burden of proof based on that evidence and a reasonable jury would thus decide all genuine material disputes in the movant's favor. Celotex Corp. v. Catrett, 477 U.S. 317, 318 (1986).

Once the movant has demonstrated that there are no genuine issues of material fact, the burden shifts to the non-moving party

12

to "make a showing sufficient to establish the existence of every
element essential to his case, based on the affidavits or by
depositions and admissions on file."  Celotex, id. at 322-323;
Sollon, id.; Fed.R.Civ.P. 56(c).  The sum of the affirmative
evidence to be presented by the non-moving party must be such that
a reasonable jury could find in its favor, and it cannot simply
reiterate unsupported assertions, conclusory allegations, or mere
suspicious beliefs to show the existence of a genuine issue.
Liberty Lobby, id., at 250-252; Podobnik v. U.S. Postal Serv., 409
F.3d 584, 594 (3d Cir. 2005).

## IV.  ANALYSIS:  THE ACCURAY CASE

Because the Accuray Case encompasses claims which are
duplicated in the Hill and Spellman Cases, including not only the
causes of action but also the allegations on which the claims are
based, we begin with Accuray's motion for summary judgment on all
counts.  The logical starting point is Count III, the claim that
Accuray violated the Pennsylvania Uniform Trade Secrets Act,
because, as will be discussed below, that Act pre-empts several
other causes of action.  However, in light of certain arguments BMI
has raised in opposition to the motions for summary judgment, we
are compelled to begin with a summary of the difficulties
associated with defining BMI's trade secrets.

In the Accuray complaint, BMI alleged that the Individual
Defendants had misappropriated "thousands of files."  (Accuray

13

Case, Doc. No. 1, ¶ 48.)   With the exception of some specific references to information Hill was alleged to have copied and shared with Accuray, the descriptions of what each Individual Defendant was alleged to have misappropriated were rather general. In a PUTSA case, as in prior trade secret litigation considered under Pennsylvania common law,[6] a plaintiff claiming its trade secrets have been misappropriated by the defendant has the obligation to identify those secrets "with reasonable particularity."   See Gentex Corp. v. Sutter, CA No. 07-1269, 2009 U.S. Dist. LEXIS 13753, *4 (M.D. Pa. Feb. 23, 2009), recognizing the plaintiff's obligation to do so and citing cases from the Southern District of New York[7] and Northern District of Georgia addressing this question.   As one court has pointed out, every court which has opined on the issue has ruled that such specificity is required in order for the defendant to be adequately apprised of

---

[6] The parties assume, and the Court agrees, that Pennsylvania law applies in these cases.   A court sitting in diversity applies the substantive law of the state in which it sits.   See Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938); Edwards v. HOVENSA, LLC, 497 F.3d 355, 361 (3d Cir. 2007). When applying Pennsylvania substantive law, if there is no controlling decision by the Pennsylvania Supreme Court, this Court will consider decisions of intermediate appellate courts, which, although not conclusive, are indicative of how the Supreme Court might decide the issue.   McGowan v. Univ. of Scranton, 759 F.2d 287, 291 (3d Cir. 1985) (such intermediate court decisions may constitute "presumptive evidence" of Pennsylvania law.)

[7] The New York case cited in Gentex addressed exactly the issue herein – the plaintiff's inability or reluctance to identify with specificity the trade secrets at issue, a situation the court referred to as the plaintiff's "Dance of the Seven Veils approach to the trade secret claim."   See sit-up Ltd., 2008 U.S. Dist. LEXIS 12017, at *25.

14

what it is alleged to have misappropriated. *See* sit-up Ltd. v. IAC/Interactive Corp., CA No. 05-9292, 2008 U.S. Dist. LEXIS 12017, *33 (S.D. N.Y. Feb. 20, 2008), citing cases from the Seventh and Ninth Circuit Courts of Appeal. This specificity is also necessary so the court "can divine the line between secret and non-secret information, and so that a jury can render a verdict based on a discriminating analysis of the evidence of disclosure and misappropriation." sit-up Ltd., id. at *34.

On March 25, 2008, the parties in the Hill Case entered into a Stipulated Order enjoining Hill from using any of BMI's "confidential and proprietary information and trade secrets" in any way.[8]  Hill also agreed to return all hard copies of BMI documents and to provide to a third-party computer forensics examiner all computers and electronic data storage media in his possession or control which might contain BMI Confidential Information.  With some agreed-upon privilege restrictions in place, the forensics

---

[8] The phrase "confidential and proprietary information and trade secrets" was defined in the Stipulated Order of March 25, 2008, as "(i) applications, source code and data files regarding products of [BMI and NOMOS], (ii) [BMI/NOMOS] product development documents and information and (iii) [BMI/NOMOS] marketing research materials.  It shall also encompass any other information which is protected by Best Medical and/or NOMOS as confidential information, including, but not limited to, information concerning [BMI/NOMOS] accounts, sales, sales volume, sales methods, sales proposals, internal financial data, customers or prospective customers, prospect lists, company manuals, formulae, products, processes, flow charts, plans, drawings, designs, technical specifications, methods, compositions, ideas, improvements, inventions, research, computer programs, system documentation, software products, patented products, copyrighted information, know-how and operating methods and other trade secret or proprietary information belonging to [BMI/NOMOS] or relating to [BMI/NOMOS's] affairs that are not public

examiner would search the computerized data to identify BMI or NOMOS information and any correspondence between Hill and Accuray dating from July 1, 2007, to October 4, 2007, the date on which he resigned from BMI. After a bit-by-bit image of Hill's computers had been made and placed in a locked box under the control of Hill's attorneys, he would permit the examiner to overwrite all information belonging to BMI on any computer or storage media he retained. (Hill Case, Doc. No. 8.) When the Spellman Case was filed, those three Defendants agreed to a Stipulated Order similar to that between Hill and BMI.  (Spellman Case, Doc. No. 15.) According to BMI, Hill had downloaded or copied approximately 17,000 files and the three other former employees had retained "thousands" of files containing BMI Confidential Information. (Doc. No. 47 at 6 and 8.)

As noted above, discovery in the Hill and Spellman Cases was suspended several times based on the representations of the parties that they were engaged in serious settlement negotiations. Moreover, the fact that BMI changed counsel twice significantly slowed down the progress of discovery in the Hill and Spellman Cases as did the filing of the Accuray Case in September 2009 and a subsequent motion to dismiss.  At the Accuray Case Rule 26(f) conference on March 15, 2010, and at a joint case management conference the following day, the parties agreed that in its Rule

---

information."  (Doc. No. 8, ¶ 3.)

16

26(a) initial disclosures, BMI would identify, with specificity, the trade secrets and confidential or proprietary information at issue in the consolidated litigation; only then would Accuray respond to discovery related to its own trade secrets and confidential information. (See Accuray Case, Doc. No. 28, at 5.)

Although BMI provided its initial disclosures, the description of the trade secrets consisted of little more than a restatement of the allegations in the three cases. (See Doc. No. 41, Exh. A, at 6.)   A series of cross motions to compel, for sanctions, for protective orders, etc., ensued, with the Court issuing repeated orders for BMI to identify its confidential proprietary information and trade secrets with the required specificity[9] and BMI responding that it was unable to fully comply because discovery was still ongoing or providing responses that were, in Accuray's view, simply repetitions of previous inadequate answers.

On June 24, 2010, in response to a motion by Accuray to compel discovery, the Court once again ordered BMI to state with reasonable particularity the confidential/proprietary business information and trade secrets Accuray was alleged to have misappropriated.   The Court simultaneously granted Accuray's motion for a protective order, stating that pending compliance with the previous sentence, BMI was "precluded from obtaining any discovery

---

[9]   See Court orders issued on November 4, 2008 (Spellman Case), and on June 16, 2010, June 24, 2010, September 28, 2010, January 18, 2011, and January 20, 2011 (Hill Case.)

relating to Accuray's trade secrets and confidential information."
(Doc. No. 60 at 2.)   This decision was consistent with those of
other courts which have required the plaintiff first to identify
the trade secrets in question before it is permitted discovery into
the defendant's confidential information.   This two-phase process
allows discovery to focus on those subjects where misappropriation
can be most easily shown through copying or other forms of improper
use.  _See_, e.g., DeRubeis v. Witten Techs., Inc., CA No. 06-807,
2007 U.S. Dist. LEXIS 30047 (N.D. Ga. Apr. 23, 2007).[10]

    Some five months later, on November 15, 2010, BMI finally
produced a binder with eight tabs that included various computer
files obtained from the Individual Defendants.   Despite a Court
Order of September 28, 2010, which had required BMI to identify the
specific portions of those files which constituted the BMI trade
secrets, only materials in five of the eight tabs of the binder

---

[10]   The court in DeRubeis described this two phase process as "reasonable"
because (1) Witten, the party seeking discovery in the case, had a good
awareness of the trade secrets allegedly misappropriated and would thus
not be required to identify "thousands" of alleged secrets; (2) since the
purported trade secrets would have to be described only with "reasonable
particularity," no 'Catch-22' dilemma would arise, i.e., a situation in
which Witten would be compelled to describe each trade secret very
specifically because it did not know exactly which trade secrets might
have been taken, only to end up missing the trade secret because it had
been described in too much detail; (3) it would prevent needless
disclosure of DeRubeis's own confidential information in the event Witten
was engaged in a fishing expedition or retaliating against the plaintiffs
for filing suit for breach of an employment contract; (4) it would
prevent unnecessary disclosure of the plaintiffs' trade secrets which
were not at issue; and (5) identifying the trade secrets with
particularity would allow the plaintiffs to prepare their defense to the
misappropriation charges. DeRubeis, id. at *15-17.

were so identified.

Meanwhile, the deposition of BMI's corporate representative (the "30(b)(6) representative") was set for December 20, 2010, at which the representative was to testify regarding the trade secrets identified in the binder.  On January 13, 2011, Accuray provided to the Court compelling evidence that the 30(b)(6) representative provided by BMI was unable to testify about the trade secrets in any detail.  Counsel for BMI represented to the Court and Accuray for the first time that another BMI representative had been "ready, willing and able" to testify more precisely on this matter and, in effect, asked for a second bite at the apple.  The Court, over Accuray's objections, granted counsel's request, with all expenses to be paid by BMI, if Accuray chose to proceed with the second deposition.  The Court also ordered, as it had in the past, that any discovery by BMI would be stayed until it complied with the rest of the Court's order.  Furthermore, because BMI had previously failed to identify any trade secret material in three of the eight sections of the binder, the claims of trade secrets were limited to the materials at tabs 2, 3, 4, 5, and 9 of the binder. (Doc. No. 95, as amended at Doc. No. 97.)

BMI identified Dr. George Cernica, a medical physicist from a not-for-profit foundation associated with BMI, as its replacement 30(b)(6) representative.  According to BMI, Dr. Cernica would be "able to testify with particularity" regarding the alleged trade

secrets identified at the five tabs in the binder produced on
November 15, 2010, including

> an estimated cost of development of the misappropriated
> trade secrets, the specific nature and functionality of
> the identified trade secrets which makes them "Trade
> Secrets," and what makes the claimed trade secrets unique
> and not commonly known in the industry or to the general
> public. Dr. Cernica will also be able to testify about
> the security measures taken by Best NOMOS to protect the
> alleged trade secrets.

(Doc. No. 99 at 2-3.)

Dr. Cernica was deposed on February 25, 2011, and conceded
during his deposition that only two items in the binder were
potential trade secrets. His identification of approximately 100
lines of computer code, discussed in more detail below, satisfied
the requirement that BMI "specify with particularity" its trade
secrets. Therefore, any time after February 25, 2011, BMI was free
to serve interrogatories, requests for production and any other
discovery pertaining to trade secrets on Accuray; there is nothing
in the record to indicate that BMI pursued such discovery.

At a status conference held on March 8, 2011, counsel for BMI
stated that he needed two additional weeks to address the trade
secret issues presented in Dr. Cernica's deposition and there was a
possibility these claims would be withdrawn. Counsel for Accuray
indicated it intended to file a motion for summary judgment on the
trade secrets issue, but was willing to wait until March 25 to
learn BMI's intention. The Court entered an order the following
day reflecting these two statements and setting a briefing schedule

in the event BMI did not withdraw its trade secrets claims.[11]   (Doc.
No. 106.)    At no time during that conference or at any time
thereafter did BMI object that it had not completed discovery.

    However, when responding to the moving parties' statements of
undisputed facts and in its briefs opposing summary judgment, BMI
frequently indicated it was unable to admit or deny particular
factual statements or to provide evidence in support of its
positions because it had been prohibited from discovery pertaining
to Accuray source code.  (See, e.g., Doc. No. 129, ¶¶ 10-13; Doc.
No. 128 at 12, "Admittedly, Dr. Cernica's testimony may have been
more detailed had he been able to view the accrual [sic] Accuray
source code. However, since [BMI] was prohibit[ed] from discovery
as it relates to the Accuray source code, Dr. Cernica's opinion is
the best evidence available to Plaintiff.")   But, through its own
computer forensics expert, BMI had access to all the so-called
confidential and proprietary business information and/or trade
secrets taken from the Individual Defendants' computers not later
than December 2008.  However, BMI failed to identify a single trade
secret until November 15, 2010, even though it knew discovery
pertaining to Accuray's computer codes and trade secret issues

---

[11] BMI has asserted that it was "directed" to dismiss its trade secret
claims. (Doc. No. 128 at 15.) Both the Order of March 8, 2011 (Doc. No.
106) and the contemporaneous notes of the law clerk who attended the
status conference reflect that BMI was directed to advise the other
parties of its intentions regarding the claims, not to withdraw the
claims.

21

hinged on identifying its own purported trade secrets with "reasonable particularity."

We further note that at any time prior to submission of its briefs in opposition to the motions for summary judgment, BMI could have sought the protection of Fed.R.Civ.P. 56(d). That rule directly addresses BMI's claim that it was not permitted adequate discovery. "A party opposing summary judgment on the basis that additional discovery is warranted must 'show[ ] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition.'" Abulkhair v. Citibank & Assocs., No. 11-2059, 2011 U.S. App. LEXIS 13235, *10 (3d Cir. June 28, 2011). If the party opposing summary judgment under Rule 56(d) also indicates what material facts it hopes to acquire through additional discovery and why that information has not previously been made available, the court has three options: (1) defer considering the motion or deny it; (2) allow time to take additional discovery; (3) or issue another appropriate order. BMI had from at least March 9, 2011, when the original briefing schedule for summary judgment was set, until June 21, 2011, when its opposition to the Accuray motion was filed, to seek additional discovery under Rule 56(d). At no time did BMI file an affidavit identifying the critical discovery, why it was not previously obtained, and how it would preclude summary judgment. Such a failure is "in all but the most exceptional cases,. . .fatal to a

22

claim of insufficient discovery." <u>Bradley v. United States</u>, 299 F.3d 197, 207 (3d Cir. 2002), *citing* Fed.R.Civ.P. 26(f).   The consequences of any inability to complete discovery – and the resultant inability to provide evidence of record in support of its arguments -- must therefore be laid directly at BMI's door.[12]

   A.   Count III – Violation of the PUTSA by Accuray

        *1.   BMI's claims:*   In the Complaint filed in the Accuray Case, BMI alleged numerous times that the Individual Defendants "wrongfully copied and retained confidential, proprietary and trade secret information belonging to" BMI and that they shared this information with Accuray.   (Accuray Case, Complaint, ¶¶ 45-46.)

   Hill was alleged to have had access to "(i) source code and data files regarding Best Medical/NOMOS products, (ii) product development documents and information, and (iii) marketing research materials" (Accuray Case, Complaint, ¶ 29), all of which fell within the scope of "Confidential Information" as that term was defined in the Hill-NOMOS Agreement.[13]   In particular, he was

---

[12] The Court's analysis of the arguments herein has been further complicated by the fact that BMI frequently denies an opposing party's statement of material facts, but fails to cite the evidence of record on which that denial is based.   Such an omission is contrary to Local Rule of Court 56 (C)(1)(b) which requires a party denying a statement of fact to "set forth the basis for the denial . . with appropriate reference to the record." Since the Court is required to view all evidence in favor of the non-moving party when considering a motion for summary judgment, we have carefully considered all evidence submitted by the parties, even when BMI has failed to point to evidence supporting its positions.

[13] "Confidential Information" was defined as "Any information which is protected by the Company [i.e., NOMOS] as confidential information and which may include, in whole or part, information concerning the Company's

alleged to have copied, retained, and shared with Accuray:

> (i) source code, libraries and data files related to
> [BMI] products, including, without limitation, Corvus,
> BAT, nomosSTAT, and Peregrine; (ii) files containing
> [BMI's] new product development efforts including,
> without limitation, the development of the Integrated
> Treatment System, Phoenix Adaptive Therapy solutions, and
> Add-on Cone Beam CT systems; and (iii) files containing
> sales information and marketing projections for existing
> [BMI] products.

(Accuray Case, Complaint, ¶ 53.)

In the confidentiality agreement between Scherch and BMI,
Sherch was prohibited from retaining, sharing or using the
Company's "Proprietary Information."[14]  He was alleged to have had
access to "(i) source code and data files regarding Best
Medical/NOMOS products and services, (ii) product development

---

accounts, sales, sales volume, sales methods, sales proposals, customers
or prospective customers, prospect lists, Company manuals, formulae,
products, processes, methods, compositions, ideas, improvements,
inventions, research, computer programs, system documentation, software
products, patented products, copyrighted information, know-how and
operating methods and other trade secret or proprietary information
belonging to the Company or relating to the Company's affairs that is not
public information."  (Accuray Case, Complaint, ¶ 24.)

[14] "Proprietary Information" was defined as "any and all of the following:
design strategy, ideas, discoveries, inventions, patents, formulas,
specifications, patterns, techniques, computations, programs, devices,
processes, methods, products, equipment, improvements, trade secrets,
computer programming in connection with any of the foregoing, financial
information, all information related to customers and prospective
customers, and other similar matter and information that [BMI] owns and
will own and uses and will use, and/or that is useful in {BMI's business.
'Proprietary Information' shall not include such matter and information
to the extent that it is publicly known or is generally utilized by other
persons or entities engaged in the same business or businesses as [BMI.}
Any failure to mark or designate Proprietary Information as
'confidential' or 'secret' shall not affect its status as proprietary
information subject to the terms of this Agreement."  (Accuray Case,
Complaint, ¶ 73.)

24

documents and information, (iii) sales information and marketing projections, and (iv) product planning strategies and initiatives." (Accuray Case, Complaint, ¶ 76.)

In the agreement between Spellman and BMI, the definition of "Proprietary Information" was identical to that in Scherch's agreement (Accuray Case, Complaint, ¶ 92) and he was alleged to have had access to "(i) source code and data files regarding Best Medical/NOMOS products and services, (ii) product development documents and information, and (iii) sales affiliation and marketing projections" (id., ¶ 99.)

In Bittman's contract with NOMOS, "Confidential Information" was defined somewhat differently from the definition used in the Hill-NOMOS Agreement.[15]  Bittman was alleged to have had access to "(i) source code and data files regarding Best Medical NOMOS products and services, (ii) product development documents and information, (iii) sales information and marketing projections, and (iv) marketing strategies." (Accuray Case, Complaint, ¶ 113.)

---

[15] Confidential Information in the Bittman-NOMOS Agreement was defined as "'Inventions'. . ., trade secrets, technical information, know-how, research and development activities of the Company, sales methods, sales plans, sales results, product and marketing plans, customer and supplier names and information, names and information regarding prospective customers and information disclosed to the Company or to me by third parties of a proprietary or confidential nature or under an obligation of confidence.  Confidential Information is contained in various media, including without limitation, patent applications, computer programs in object and/or source code, flow charts and other program documentation, manuals, plans, drawings, designs, technical specifications, laboratory notebooks, supplier and customer lists, internal financial data and other documents and records of the Company." (Accuray Case, Complaint, ¶ 110.)

BMI specifically alleged that "the afore referenced confidential information and proprietary information constitutes legally protectable trade secrets as defined by [the PUTSA.]" (Accuray Case, Complaint, ¶ 131; *see also* ¶ 139, stating that "the misappropriation and wrongful use of Best Medical's confidential proprietary trade secret information constitutes a violation of the [PUTSA].") Finally, BMI alleged that "Accuray has accepted and utilized in its business the 'trade secrets' of the Plaintiff." (Id., ¶ 142.) None of the BMI or NOMOS contracts with the Individual Defendants explicitly defined the term "trade secrets."

     2. *Accuray's arguments:*[16] In the brief in support of its motion for summary judgment on Count III, Accuray offers two arguments. First, the Alleged Trade Secrets (as defined below) fail to satisfy the definition of trade secrets under the PUTSA because (a) BMI has failed to present evidence establishing their independent economic value; (b) BMI took no reasonable efforts to protect the secrecy of its software code; and (c) the Alleged Trade Secrets are either a well-known programming technique or could be readily reproduced by any competent programmer. Second, the record is devoid of any facts suggesting misappropriation by Accuray and the forensic analysis by Accuray's expert conclusively establishes

---

[16] Although BMI stated several allegations against the Individual Defendants for violation of the PUTSA in this section of its Complaint, those allegations are duplicated in the Hill and Spellman Cases and will be discussed in Sections V.C and VI.B below.

that Accuray did not misappropriate the Alleged Trade Secrets.

      *3. Relevant law:* Under the Pennsylvania Uniform Trade Secrets Act, a trade secret is defined as:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. C.S. § 5302.

      This is essentially the same definition as that used prior to April 2004 when the PUTSA became effective. Youtie v. Macy's Retail Holding, Inc., 626 F. Supp.2d 511, 529 n.10 (E.D. Pa. 2009) ("The PUTSA displaced Pennsylvania's common law tort for misappropriation of trade secrets, but there is no indication that the statute effected a substantive shift in the definition of 'trade secret.'") Determining whether the information in question qualifies as a trade secret must be made on a case-by-case basis. *See* O.D. Anderson, Inc. v. Cricks, 815 A.2d 1063, 1071 (Pa. Super. Ct. 2003). This is generally a question of fact left for the jury. Bro-Tech Corp. v. Thermax, Inc., 651 F. Supp. 2d 378, 410 (E.D. Pa. 2009). However, as another court has noted, such "factual issues are subject to summary judgment whenever the law as applied to uncontroverted facts shows that the movant is entitled to summary

judgment." <u>Youtie</u>, 653 F. Supp.2d at 623, *quoting* <u>Camelot</u>
<u>Technology, Inc., v. RadioShack Corp.</u>, CA No. 01-4719, 2003 U.S.
Dist. LEXIS 2517, *16 (E.D. Pa. Feb. 14, 2003), and finding that
the defendants' data compilation fulfilled the requirements of a
trade secret under the PUTSA.

The Pennsylvania Superior Court has identified a number of
factors to be considered when determining if particular information
constitutes a trade secret:

> (1)   the extent to which the information is known
>       outside of the company's business;
>
> (2)   the extent to which the information is known by
>       employees and others involved in the company's
>       business;
>
> (3)   the extent of the measures taken by the company to
>       guard the secrecy of the information;
>
> (4)   the value of the information to the company and its
>       competitors;
>
> (5)   the amount of effort or money the company spent in
>       developing the information; and
>
> (6)   the ease or difficulty with which the information
>       could be acquired or duplicated legitimately by
>       others.

<u>Crum v. Bridgestone/Firestone N. Am. Tire, LLC</u>, 907 A.2d 578, 585
(Pa. Super. Ct. 2006); *see also* <u>SI Handling Systems, Inc. v.</u>
<u>Heisley</u>, 753 F.2d 1244, 1256 (3d Cir. 1985).

Under the PUTSA, to establish misappropriation of a trade
secret, the plaintiff must show that the defendant used or
disclosed information that it knew or had reason to know was a

trade secret and that the defendant acquired such information by improper means.  12 Pa. C.S. § 5302;[17] *see also* Moore v. Kulicke & Soffa Indust., Inc., 318 F.3d 561, 566 (3d Cir. 2003), stating that the elements of a trade secrets misappropriation claim are "(1) the existence of a trade secret; (2) communication of the trade secret pursuant to a confidential relationship; (3) use of the trade secret in violation of that confidence; and (4) harm to the plaintiff."  Failure to establish any one of the elements defeats the claim.  Block v. Blakely, CA No. 02-8053, 2004 U.S. Dist. LEXIS 16920, *7 (E.D. Pa. Aug. 25, 2004) (granting summary judgment without reaching the defendants' arguments that certain documents did not contain legally protectable trade secrets or that a third party used or disclosed information therein because the plaintiff failed to show it had kept the documents confidential.)

   *4.  Discussion and conclusion:*  We begin our analysis with the first element of a trade secrets misappropriation claim as stated in Moore, i.e., the existence of a trade secret, and

---

[17]  In full, "misappropriation" is defined as: "(1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: (A) derived from or through a person who had utilized improper means to acquire it; (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake." 12 Pa. C.S. § 5302.

immediately hit a major stumbling block.[18]  As discussed above, BMI was unable to identify the information it contended were trade secrets until November 15, 2010, when it provided a binder containing eight source code excerpts.  Following the deposition of BMI's second 30(b)(6) representative, Dr. Cernica, the parties stipulated on May 19, 2011, that "the sole remaining alleged trade secrets at issue in this lawsuit as to Defendant Accuray" were (1) a highlighted portion of source code in Binder Tab 2 at pages 3-4, referred to by the parties as "DoseLookUp" and (2) a highlighted portion of code in Binder Tab 3 at pages 5-6, referred to as "GetDoseSlice."  (Doc. No. 122 and Exhs. A and B thereto.)  The parties refer to the two portions of source code collectively as the "Alleged Trade Secrets;" they consist of approximately 100 lines of code in total.

BMI argues summary judgment cannot be granted to Accuray on the PUTSA claim because Dr. Cernica's testimony raises genuine issues of material fact.[19]  (Doc. No. 128 at 11-13.)  In arriving at

---

[18]   Because we ultimately conclude that BMI has failed to establish that either of the Alleged Trade Secrets is, in fact, a trade secret to be protected under the PUTSA, we need not address the parties' other arguments regarding the extent and effectiveness of BMI's efforts to keep them secret or their alleged economic value.

[19]  This is one of the points on which BMI argues Dr. Cernica's testimony could have been more detailed had he not been prohibited by the Court's June 24, 2010 order from reviewing Accuray's source code.  (Doc. No. 128 at 12.)   Since Dr. Cernica's testimony focused on explaining why BMI's DoseLookUp and GetDoseSlice source code constituted trade secrets, not how Accuray had misappropriated and/or used this code, the Court is unable to understand how his testimony on this point could have been improved if he had access to Accuray's source code.

this position, BMI points to the following excerpts from his testimony:

- Dr. Cernica testified that there was an economic value to the Alleged Trade Secrets. "I don't think it's a question that hours are placed into many of these functions. These are complex sub-routines. Very complex code." (Doc. No. 130, Exh. D, Deposition of George Cernica, "Cernica Depo.," at 144.)

- The trade secret in the DoseLookUp code consisted of "how commonly known functions were used together." (Cernica Depo. at 165.)

- Dr. Cernica described the source code as "a very efficient form of the bilinear interpolation" and testified that such functionality is a trade secret. (Id. at 164-165.)

- The source code has never been released to anyone or published in any form. (Id. at 174.)

- Dr. Cernica identified the GetDoseSlice code as a trade secret "for the reasons stated in his testimony." (Id. at 179-180.)

To rebut BMI's claim that the two excerpts of source code actually satisfy the criteria for protectable trade secrets, Accuray engaged the services of Randal E. Bryant, a professor and Dean of the School of Computer Science at Carnegie-Mellon University.[20] (See Doc. No. 121, Exh. 10, "Bryant Report.") Dr. Bryant performed a multi-part analysis of the Alleged Trade Secrets. First, he compared the functionality and structure of the source code excerpts to determine if they contained features that

---

[20] See Dr. Bryant's curriculum vitae at paragraphs 3 through 6 of his report and Exhibit 1 thereto. (Doc. No. 121, Exh. 10.)

could be considered trade secrets.  He next performed a forensic comparison of the BMI/NOMOS CORVUS code to the Accuray MultiPlan Treatment Planning Software ("MultiPlan software"), the Accuray product which allegedly incorporated the misappropriated trade secrets.

In his deposition, Dr. Cernica had testified that it was his opinion that the use of bit shifting, combined with bilinear interpolation, created a very efficient form of bilinear interpolation which made the DoseLookUp code a trade secret. (Cernica Depo. at 173-175.)  Dr. Bryant concluded that bit shifting and bilinear interpolation were both well-known practices and that both techniques, "as well as their combination, would be generally known to competent programmers and, therefore cannot be considered trade secrets."  (Bryant Report, ¶¶ 14-32.)

Dr. Cernica had also testified that the GetDoseSlice code was a trade secret due to its method of implementing linear combination.  He conceded that the concept of linear combination was not developed by either NOMOS or BMI, but stated that the code's implementation of linear combination was the trade secret. (Cernica Depo. at 194.)  He was unable to point to any part of the code that was not "obvious," but stated his opinion, based on his personal experience, that the excerpts would not be "easy to code." (Id., 198-199.)  By contrast, Dr. Bryant stated that the code in question had a very simple form and control structure and that the

32

concept of linear combination was well-known and routinely used by programmers, as evidenced by such readily available sources as a Wikipedia entry.   He concluded there was no feature of the GetDoseSlice function "that could not be readily reproduced by any competent programmer" and therefore it could not be considered a trade secret.   (Bryant Report, ¶¶ 33-38.)

In the second part of his report, Dr. Bryant compared the two Alleged Trade Secrets not only to the relevant portions of the Accuray code which supposedly integrated them, but to over 1.65 million lines of code comprising the entire Accuray MultiPlan software.[21]  His examination consisted of three analyses.  First he compared the coding styles, for example, the extensive use of coding templates in the Accuray code, a technique which was not used in the NOMOS code.  According to Dr. Bryant, such differences would make it difficult to directly incorporate the NOMOS code into the Accuray code base, even if some functions were re-written. Consequently, any motivation Accuray might have to use the NOMOS code would be greatly reduced.  (Bryant Report,  ¶¶ 43-45.)

Next, Dr. Bryant ran the two computer codes through the "MOSS program," a tool widely used by computer science instructors to detect  if  students  have  copied  from  one  another  in  their

---

[21]   Dr. Bryant received three electronic versions of NOMOS code which included the Alleged Trade Secrets, but concentrated on version 6.3r2 of the CORVUS code which appeared to be the only one to which Hill would have had access, given his departure from NOMOS in October 2007.  (Bryant Report, ¶ 8.)

programming assignments and in legal applications such as detecting intellectual property infringements. This highly sophisticated program incorporates functions to detect syntactic changes and a routine that reports near matches as well as identical fragments in the two files being compared. In this analysis, instead of limiting his comparison of Accuray code to just the Alleged Trade Secrets, Dr. Bryant compared five NOMOS files (over 40,000 lines of code), including the Alleged Trade Secrets, to the entire Accuray MultiPlan software, using the most sensitive detection level of the MOSS program. The comparison disclosed four fragments of NOMOS code that had similar counterparts in the Accuray code. Most significantly, the NOMOS files where the similarities existed were not the files which incorporated the DoseLookUp or the GetDoseSlice code. Upon closer analysis, Dr. Bryant concluded that the matching fragments represented very common code sequences which would be expected when comparing 1.65 million lines to a different 40,000 lines of code. Moreover, the fragments were completely unrelated in substance and, thus, in his opinion, the matches were only coincidental. (Bryant Report, ¶¶ 46-59.)

Finally, Dr. Bryant conducted a pattern and keyword analysis of the Accuray MultiPlan software using a program he developed for just that purpose. This analysis revealed no evidence that the MultiPlan software used code or features from the Alleged Trade Secrets. (Bryant Report, ¶¶ 60-67.) From all his analyses, Dr.

34

Bryant concluded (1) DoseLookUp and GetDoseSlice were not trade secrets, (2) no aspect of the Alleged Trade Secrets had been used or incorporated into the MultiPlan software, and (3) no aspect of the 40,000 lines of NOMOS/BMI code (not just the 100 or so lines in the Alleged Trade Secrets) was used or incorporated into the Accuray software. Contrary to Dr. Cernica's testimony, the use of bit shifting in the Accuray code did not occur in any of the three implementations of bilinear interpolation; those implementations had very different forms from what was in the NOMOS code, and there was no use of the term "linear combination" in the Accuray code. (Id., ¶¶ 68-70.)

The Court has reviewed all the excerpts from Dr. Cernica's testimony provided by the parties. (See Doc. No. 121, Exh. 2; Doc. No. 130, Exh. D; Doc. No. 134, Exh. 17; and Doc. No. 138, Exh. 13.) Dr. Cernica was unable to estimate the time necessary to write the code comprising the Alleged Trade Secrets; he had no documentation to support his conclusions, but opined it was only "common sense" that writing such functions required hours rather than minutes. (Cernica Depo. at 144.) He did no analysis to determine if the Alleged Trade Secrets had any economic value (id. at 144-145), nor did he determine the cost involved with development of the Alleged Trade Secrets (id. at 141.) He could not testify from his own knowledge that bilinear interpolation (which he conceded "lots of people do") with the bit shifts was a trade secret, but relied on

35

the opinion of someone else at BMI, a Mr. Romesberg.  (Id. at 165-
166.) Regarding the GetDoseSlice source code, Dr. Cernica indicated
he had "talk[ed] to Mr. Romesberg again" and determined it was a
trade secret.  (Id. at 179-180.)  Dr. Cernica conceded he was not a
forensic expert on code (id. at 108) nor a computer programmer, so
it was "very hard to really tell where the efficiencies are," but
he relied on "general knowledge." (Id. at 168.)  As for the
competitive market advantage obtained from the BMI code, he did not
do any analysis on the subject, but opined, "I don't think it's a
question, though, that [the code efficiency] is a competitive
advantage." (Id. at 145.)

    A comprehensive reading of Dr. Cernica's testimony reveals
that unlike Dr. Bryant, he was not an expert in computer
programming qualified to opine on the question of whether the
coding which forms the GetDoseSlice or DoseLookUp functions were or
were not well-known computer programming practices that would be
generally known to competent programmers, i.e., were "readily
ascertainable by proper means."  Dr. Cernica's opinions on what
constituted a trade secret were derived from other individuals at
BMI (e.g., Merle Romesberg whose expertise is unknown) to whom he
would "rather defer" on the questions of whether something was a
trade secret, whether it was innovative, its potential economic
value, and what others in the industry know or use.  (See, e.g.,
Doc. No. 138, Exh. D, at 143, 164, 166, 184, 191, 192, 197-198.)

36

In short, contrary to BMI's argument, nothing in Dr. Cernica's testimony raises issues of material fact sufficient to withstand summary judgment on the question of whether the Alleged Trade Secrets were in fact worthy of protection under the PUTSA.  *See* Brown & Brown, Inc. v. Cola, CA No. 10-3898, 2011 U.S. Dist. LEXIS 31147, *25 (E.D. Pa. Mar. 23, 2011) (at summary judgment the moving party can meet its burden by pointing out that there is no evidence to support the non-moving party's claims and the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts") (*quoting* Matsushita, 475 U.S. at 586.)

        "To prevail under the terms of the PUTSA, the. . .plaintiff [must] demonstrate the existence of a trade secret."  Hecht v. Babyage, CA No. 10-724, 2010 U.S. Dist. LEXIS 106895, *13 (M.D. Pa. Oct. 6, 2010).   In considering a motion for summary judgment, courts have relied on reports by defendants' experts which show that the purported trade secrets (1) are readily ascertainable by trial and error of others in the field, (2) are nothing more than "mere variations on widely used processes," or (3) are techniques "well understood and commonly used" in the discipline.  Johnson v. Simonton Bldg. Prods., CA No. 08-2198, 2011 U.S. Dist. LEXIS 7671, *37-*40 (D. Kan. Jan. 26, 2011) (applying the Minnesota Uniform Trade Secrets Act incorporating the same definition of "trade secret" as the PUTSA.)   In the face of such expert reports, the plaintiff cannot rely simply on "unconvincing arguments and

37

uncompelling analogies." Id. at *39.  Dr. Cernica was offered by
BMI as its second expert who would be "able to testify with
particularity" regarding "an estimated cost of development of the
misappropriated trade secrets, the specific nature and
functionality of the identified trade secrets[,]. . .what makes the
claimed trade secrets unique and not commonly known in the industry
or to the general public [and] security measures taken by Best
NOMOS to protect the alleged trade secrets." (Doc. No. 99 at 2-3.)
The Court is not persuaded by Dr. Cernica's testimony that he
accomplished any of these goals. Summary judgment is granted in
favor of Accuray on BMI's claim that it violated the PUSTA.

Before discussing each of the remaining tort claims against
Accuray and/or the Individual Defendants, we clarify the scope of
our review.  Accuray correctly argues that to the extent the
allegations pertain to the Alleged Trade Secrets, the tort claims
are pre-empted; consequently, in the discussions which follow, we
have omitted reference to this general argument.  However, as BMI
argues, its claims apply not only to the Alleged Trade Secrets, but
to other BMI confidential and proprietary business information as
well.  In addition, the tortious interference with contract claim
and conspiracy claims are not necessarily pre-empted by the PUTSA.
See 12 Pa. C.S. § 5308.  Therefore, for each of the remaining
claims in the Accuray Case, we limit our discussion to confidential
and proprietary business information which does not rise to the

38

level of a trade secret and to actions allegedly taken by Defendants which did not pertain solely to the Alleged Trade Secrets.

B.  Count V – Conversion by Accuray

1.  *BMI's claims:*  Best Medical alleged that when the four Individual Defendants "copied, retained and stole confidential business and proprietary information," they were doing so as the "servants and agents of the Defendant Accuray, acting within the course and scope of their agency." (Accuray Case, Complaint, ¶¶ 156-158.)  Because Accuray knew "the purloined and converted confidential information and trade secrets" belonged to BMI, its willful, intentional, malicious and egregious retention and use of that property constituted a wrongful conversion under Pennsylvania law. (Id., ¶¶ 159, 162.)

2.  *Accuray's arguments:*  Accuray argues that BMI has failed to introduce any record evidence in support of its claims that non-trade secret confidential information was taken by the Individual Defendants and improperly shared with Accuray. (Doc. No. 119 at 23-24; Doc. No. 132 at 13, 18-19.)

3.  *Relevant law:*  Conversion is defined under Pennsylvania law as "the deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification." Universal Premium Acceptance Corp. v. York Bank &

Trust Co., 69 F.3d 695, 704 (3d Cir. 1995).   A viable claim of conversion of confidential business information must allege that the defendant acquired the information through misconduct.   Ideal Aerosmith, Inc. v. Acutronic United States, Inc., CA No. 07-1029, 2007 U.S. Dist. LEXIS 91644, *27 (W.D. Pa. Dec. 13, 2007), citing Den-Tal-Ez, Inc. v. Siemens Capital Corp., 566 A.2d 1214, 1231 (Pa. Super. Ct. 1989).

The PUTSA explicitly pre-empts claims of conversion as they apply to trade secrets.   See 12 Pa. C.S. § 5308, stating that the PUTSA displaces conflicting tort law providing civil remedies for misappropriation of a trade secret.   However, "[i]nformation need not rise to the level of a trade secret in order to qualify for protection under other theories."   Youtie, 626 F. Supp.2d at 522 n.9.   Pennsylvania   courts   have   adopted   Section   759   of   the Restatement (2d) of Torts which states:   "One who, for the purpose of advancing a rival business interest, procures by improper means information about another's business is liable to the other for the harm   caused   by   his   possession,   disclosure   or   use   of   the information."   See Pestco, Inc. v. Associated Prods., Inc., 880 A.2d 700, 708-709 (Pa. Super. Ct. 2005).   Even after enactment of the PUTSA, courts applying Pennsylvania law have continued to recognize a separate tort of conversion regarding confidential or proprietary information. See, e.g., Pierre & Carlo, Inc. v. Premier Salons, Inc., 713 F. Supp.2d 471, 481-482 (E.D. Pa. 2010) (allowing

conversion claim to proceed inasmuch as the Restatement of Torts §
759 cmt. b, identified customer lists as confidential information,
i.e., "information about one's business whether or not it
constitutes a trade secret"); Cenveo Corp. v. Slater, CA No. 06-
2632, 2007 U.S. Dist. LEXIS 9966, *13 (E.D. Pa. Feb. 13, 2007)
("without clear intent, it should not be assumed that the
Pennsylvania legislature's enactment of the [PUTSA] was intended to
abrogate common law conversion claims based on the taking of
information that, though not a trade secret, was nonetheless of
value to the claimant"); and EXL Labs., LLC v. Egolf, CA No. 10-
6282, 2011 U.S. Dist. LEXIS 25295, *24 (E.D. Pa. Mar. 11, 2011)
(reasoning at the motion to dismiss stage that if the court were to
dismiss the plaintiff's conversion claim and later determine that
the confidential information was not protected by the PUTSA, the
plaintiff would be left without a remedy.)

    *4. Discussion and conclusion:* BMI in effect concedes
that the viability of its conversion claim is determined by this
Court's decision on the PUTSA claim. (Doc. No. 128 at 6 and 10.)
It argues – correctly – that the common law conversion claim would
be pre-empted if the Court were to determine that the only
information misappropriated by Accuray and/or the Individual
Defendants was the Alleged Trade Secrets, i.e., a violation of the
PUTSA. (Id., at 10.) Unfortunately, that is the full extent of
BMI's argument. That is, BMI appears to assume that the conversion

41

claim must go forward if, as has been decided here, the GetDoseSlice and Dose Look Up code segments are not protected trade secrets. But BMI offers no argument or evidence to support its conversion allegations.   For instance, there is no evidence to support its claim that the Individual Defendants were acting as the "agents" of Accuray when they left BMI with non-trade secret but confidential information on their computers.   BMI also appears to have given up on the argument that the "tens of thousands of files" on the Individual Defendants' computers contained confidential and/or proprietary information other than the Alleged Trade Secrets since not a single example of such information is mentioned in BMI's brief in opposition to the Accuray motion for summary judgment.   The Court has carefully reviewed the other pleadings filed by BMI in opposition to the Individual Defendants' motions (Doc. Nos. 146 and 148) and has found no examples of other non-trade secret yet confidential information.

In sum, BMI has failed to show that the Individual Defendants acquired the documents and files found on their computers and storage media by improper means, much less that Accuray acquired such information through their misconduct thereafter.   Summary judgment on this claim is granted in favor of Accuray.

C.   Count VI -- Unfair Competition by Accuray

1.   *BMI's claims:*   BMI makes numerous allegations regarding unfair competition in its Complaint.   First, it alleges

that Accuray tortiously interfered with the employment contracts it
had with Hill, Spellman, Bittman and Scherch in order to obtain an
unfair competitive advantage. (Accuray Case, Complaint, ¶ 122.)
Second, the purpose of the alleged conspiracy among Accuray and the
Individual Defendants was to gain an unfair competitive advantage
in the marketplace and/or to intentionally harm BMI. (Id., ¶ 129.)
Most specifically, BMI claims that Accuray unfairly competed with
it by (1) systematically inducing the Individual Defendants to
leave BMI and move to Accuray; (2) wrongfully inducing the
Individual Defendants to steal and reveal BMI's Confidential
Information; and (3) using the stolen information in a successful
attempt to destroy or cripple an integral part of BMI's business.
(Id., ¶¶ 163-166.) BMI alleges it is entitled to punitive damages
on this claim because Accuray's actions were "willful, intentional,
malicious and under the circumstances egregious." (Id., ¶ 168.)

        2.  *Accuray's arguments:*  Accuray argues that even if
this claim is not pre-empted by the PUTSA, BMI is attempting to use
the tort of unfair competition as "a virtual catch-all" for other
forms of wrongful business conduct, a tactic which has been
rejected by Pennsylvania courts. Second, since unfair competition
is "generally understood as the act of passing off one's goods as
those of another" and there is no evidence to support such a claim
in this matter, Count VI must fail. (Doc. No. 132 at 19-20.)

        3.  *Relevant law:*    Contrary to Accuray's second

43

argument, the Pennsylvania Supreme Court has noted that in addition
to the traditional scope of "unfair competition" which limits this
tort to the act of "palming off of one's goods as those of a rival
trader," the concept has been extended in some business settings to
include misappropriation as well as misrepresentation.  Pottstown
Daily News Publishing Co. v. Pottstown Broadcasting Co., 192 A.2d
657, 662 (Pa. 1963) (internal citations omitted.)  "Pennsylvania
courts have recognized a cause of action for the common law tort of
unfair competition where there is evidence of, among other things,.
. . tortious interference with contract, improper inducement of
another's employees, and unlawful use of confidential information."
Synthes (USA) v. Globus Med., Inc., CA No. 04-1235, 2005 U.S. Dist.
LEXIS 19962, *24 (E.D. Pa. Sept. 14, 2005) (citing cases); see also
EXL Labs., 2011 U.S. Dist. LEXIS 25295 at *26, recognizing that
Pennsylvania courts have adopted a definition of unfair competition
which is coextensive with that in the Restatement (3d) of Unfair
Competition, § 1 (1995).  However, "the overwhelming majority of
courts have rejected expansive dictionary definitions of 'unfair
competition' that generally encompass harms to the public."  USX
Corp. v. Adriatic Ins. Co., 99 F. Supp.2d 593, 620 (W.D. Pa. 2000)
(internal quotations omitted.)  "[I]f the means of competition are
otherwise tortious with respect to the injured party, they will
also ordinarily constitute an unfair method of competition. . . .
Nevertheless, the term may not be construed as a virtual catch-all

44

for any form of wrongful business conduct or to include all forms of modern business torts." Giordano v. Claudio, 714 F. Supp.2d 508, 522 (E.D. Pa. 2010) (internal quotations omitted.)

    4. *Discussion and conclusion*: We consider each of BMI's alleged acts of unfair competition. First, the claim that Accuray engaged in unfair competition by tortiously interfering with the employment contracts between BMI/NOMOS and the Individual Defendants precisely duplicates an allegation in Count I. The same applies to the conspiracy claim raised in Count II. The unfair competition claim therefore fails insofar as it rests on these allegations, because, as discussed below, those tort claims cannot withstand summary judgment.

    We turn to the three-part claim in the Complaint at ¶¶ 163-168, that is, Accuray (1) induced the Individual Defendants to leave BMI and move to Accuray; (2) induced them to steal BMI's Confidential Information; (3) used the stolen information to destroy or cripple BMI's business.

    If Accuray had systematically induced the Individual Defendants to leave BMI in order to gain an unfair market advantage over it, we agree with BMI that such actions would constitute a form of unfair competition. See Morgan's Home Equipment Corp. v. Martucci, 136 A. 2d 838, 847 (Pa. 1957) ("The systematic inducing of employees to leave their present employment and take work with another is unlawful when the purpose of such enticement is to

45

cripple and destroy an integral part of a competitive business organization rather than to obtain the services of particularly gifted or skilled employees. . .[or] when the inducement is made for the purpose of having the employees commit wrongs, such as disclosing their former employer's trade secrets or enticing away his customers.")  However, BMI's allegations of improper inducement are based on pure speculation.[22]  For example, the e-mails pertaining to Hill's interview trip to Accuray in late September 2007 which BMI summarizes in great detail (Doc. No. 148 at 11-14) imply that Hill approached Accuray about a job, not vice versa. Hill actually received a lower salary and bonus than he wanted (*compare* Doc. No. 150, Exhs. 6 and 8) and did not get the vice president title he sought, evidence which would tend to refute the claim that Accuray was trying to "entice" him to leave BMI.  There is no evidence in the record about *any* pre-employment contacts between Accuray and Bittman, Scherch or Spellman before they left BMI, let alone evidence from which one could infer that they had been induced to leave or to steal BMI's Confidential Information.

Finally, as pointed out in the discussion of Dr. Bryant's

---

[22]  BMI offers nothing by way of argument or evidence in its brief opposing Accuray's motion for summary judgment on this Count.  In fact, its entire argument consists only of a reiteration, practically word-for-word, of the allegations in the Complaint. (*Compare* Accuray Case, Complaint, ¶¶ 163-168, with Doc. No. 128 at 10-11.)  At summary judgment, the plaintiff cannot simply rest on "unsupported assertions, conclusory allegations, or mere suspicious beliefs," but must come forward with sufficient **evidence** to raise a genuine issue of material fact.  <u>Liberty Lobby</u>, 477 U.S. at 250-252 (emphasis added by the Court.)

expert report above in Section IV.A.4, there is no evidence that the extremely minor duplications which appear in the NOMOS code and in over 1.6 million lines of Accuray code are anything other than coincidental, thus refuting any claim that Accuray used BMI's code to unfairly compete with it in the development of products or services. And, as discussed in Section IV.B.4 above, BMI appears to have abandoned any claims based on misappropriation of other forms of confidential or proprietary information, e.g., customer lists or strategic planning documents, which would have harmed its market position.

In the absence of evidence to support BMI's claims of unfair competition, summary judgment is granted in favor of Accuray.

D.    Count I -- Tortious Interference
      with Contracts by Accuray and Hill[23]

1.    *BMI's claims:*  BMI alleges that Accuray was fully aware that the Individual Defendants each had non-compete and confidentiality agreements with BMI and the terms of those agreements. Nevertheless, Accuray tortiously interfered with the contracts in order to obtain a competitive market advantage over, and intentionally inflict harm on, BMI.  (Accuray Case, Complaint, ¶ 35.)  BMI argues that a series of e-mails between Accuray and Hill, especially a reference to "hard deliverables" Hill would be required to deliver, show how Accuray solicited Hill to terminate

---

[23]   John Does 1 through 5 are also included in this Count but as noted above, they seem to have disappeared from the lawsuit.

his relationship with BMI.[24]   (Doc. No. 128 at 7.)   Furthermore,
Hill joined in this interference after he became employed by
Accuray, as shown by his acts of recruiting Scherch, Spellman and
Bittman to work for Accuray.  (Id., ¶¶ 117-124.)

        2.   *Defendants' arguments:*  Accuray argues that BMI's
reliance on a single e-mail, sent after Hill had already agreed to
go to work for Accuray, is insufficient at the point of summary
judgment to show that it tortiously interfered with the Hill-NOMOS
Agreement.    Moreover,  this  lack  of  evidence  is  particularly
egregious because Accuray produced "several hundreds of pages" of
communications between Hill and Accuray, thus the absence of
factual support for BMI's claims cannot be the result of lack of
discovery.  (Doc. No. 132 at 14-16 and n. 9.)

     Hill argues that summary judgment should be entered in his
favor  on  this  claim  because  BMI  has  failed  to  introduce  any
evidence of specific acts he took which would have interfered with
the employment contracts of Bittman, Scherch and Spellman.   Nor is
there any evidence he instructed or induced the other Individual
Defendants to copy BMI's Confidential Information to their own
computers and transfer it to Accuray.   Finally, there is no
evidence that he interfered with the agreements between NOMOS
and/or BMI and the Individual Defendants by soliciting their move

---

[24]   The discussion of how Hill was allegedly solicited to provide "hard
deliverables" appears in Section V.C.4 below.

to Accuray. (Doc. No. 137, ¶ 9; Doc. No. 138 at 17-18.)

       3. *Relevant law:* To succeed on a claim of tortious interference as applied to an existing contract, the plaintiff must establish:

> (1) the existence of a contractual relation between the plaintiff and a third party;
>
> (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation;
>
> (3) the absence of privilege or justification on the part of the defendant; and
>
> (4) actual legal damage as a result of the defendant's conduct.

Skiff re Business, Inc. v. Buckingham Ridgeview, LP, 991 A.2d 956, 966 (Pa. Super. Ct. 2010) (citations omitted).

    To establish the third element of a tortious interference claim, the plaintiff must show that the defendant's action was somehow "improper." Yaindl v. Ingersoll-Rand Co. Standard Pump-Aldrich Div., 422 A.2d 611, 622 (Pa. Super. Ct. 1978) (the phrase "'the absence of privilege or justification on the part of the defendant,' is merely another way of stating that the defendant's conduct must be improper.") The Restatement (2d) of Torts, § 767, provides a number of factors to be considered in determining if the conduct is improper: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of

49

action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties." Yaindl, 422 A.2d at 618.

    *4. Discussion and conclusion:* We conclude that BMI's claims of tortious interference must fail for lack of factual support in the record. BMI has failed to identify any evidence to support its claim that someone at Accuray knew each of the Individual Defendants was party to an employment agreement with BMI, even though that relationship might be surmised from the nature of the business in which Accuray and BMI are engaged. Second, Hill has stated under penalty of perjury that he never asked any of the other Individual Defendants to download, keep or share with Accuray any BMI Confidential Information. (Doc. No. 138, Exh. 15, ¶ 37.) BMI offers no evidence to refute this sworn statement and in fact does not even address this issue in its brief in opposition to the Hill motion for summary judgment.

    The evidence shows that Accuray may have made the initial contact with Hill on September 14, 2007, when Chris Raanes wrote: "I heard that Nomos has just changed ownership. I'd love to talk to you about that." (Doc. No. 150, Exh. 6.)[25] However, there is no evidence that Accuray deliberately sought out Hill in an attempt to

_____

[25] Raanes and Hill knew each other prior to this date and in fact Hill had proposed the possibility of NOMOS providing Accuray with various treatment planning technologies. (*See* Doc. No. 150, Exh. 6.)